# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| HARDEE'S RESTAURANTS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| ARC BURGER, LLC. and ANAND U. GOWDA, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT

---

Plaintiff Hardee's Restaurants LLC ("HR"), for its Complaint against Defendants ARC Burger LLC ("ARC") and Anand U. Gowda ("Gowda" and collectively with ARC, the "Defendants") states as follows:

### I.    INTRODUCTION

1. HR is the franchisor of the iconic Hardee's® quick service restaurant system.

2. ARC is an entity that was formed by High Bluff Capital Partners, a private investment firm with investments in several well-known consumer brands, including as the franchisor, owner, and/or operator of the quick-service restaurant brands Church's Chicken, Quiznos, and Taco Del Mar. To expand its portfolio of quick-service restaurant brands, High Bluff formed ARC to acquire a portfolio of Hardee's® franchised restaurants in August 2023.

3. Since August 2023, ARC has been a Hardee's® franchisee, with the nonexclusive right to operate, as relevant to this action, 77 Hardee's® franchised restaurants in Alabama,

Florida, Georgia, Illinois, Kansas, Missouri, Montana, South Carolina, and Wyoming pursuant to the terms of the parties' Franchise Agreements.

4. As set forth in the Franchise Agreements, in exchange for a license to use the unique and distinctive Hardee's® franchise system and proprietary trade names, trademarks, service marks, trade dress, etc., and to operate Hardee's® restaurants, among other benefits obtained under the Franchise Agreements, ARC agreed to pay royalties and other fees to HR.

5. ARC has continuously operated the 77 Hardee's® restaurants (including multiple restaurants that are operated out of locations for which ARC has rental obligations to HR pursuant to the terms of various Sublease Agreements) and to use HR's proprietary system and marks, but ARC is in default of its payment obligations to HR.

6. HR has worked with ARC with respect to its payment defaults, including by attempting to reach agreements with ARC on a payment plan for past-due amounts. But ARC has refused HR's efforts to enter into a workout agreement, and despite periodic partial payments, the total amount owed to HR continues to increase each week. As of the date of this action, ARC owes HR more than $6.5 million.

7. Ultimately, HR exercised its contractual right to terminate ARC's Franchise Agreements in September 2025.

8. HR, however, agreed to allow ARC to continue to operate the 77 Hardee's® restaurants post-termination due to the parties' shared interest in finding a buyer for the restaurants in order to keep them operating under the Hardee's® marks and brand. But HR's agreement to allow ARC to operate post-termination was expressly conditioned on ARC's remaining current on its ongoing payment and other obligations to HR.

1626048738.1

9. ARC has failed and refused to remain current on its ongoing payment and other obligations to HR, despite all signs showing that ARC is profitably running the restaurants. Wherever ARC's profits are going, they are not being applied to past-due or ongoing fees owed to HR.

10. By this action, HR seeks to recover the outstanding amounts that it is owed under the plain terms of the parties' agreements.

## II.  PARTIES

11. HR is a limited liability company organized under the laws of the state of Delaware with its principal place of business located at 6700 Tower Circle, Suite 1000, Franklin, Tennessee, 37067.

12. HR's sole member is Hardee's Funding LLC, a Delaware limited liability company with its principal place of business in Franklin, Tennessee. Hardee's Funding LLC's sole member is Hardee's SPV Guarantor LLC, a Delaware limited liability company with its principal place of business in Franklin, Tennessee. Hardee's SPV Guarantor LLC's sole member is Hardee's Food Systems LLC, a North Carolina limited liability company with its principal place of business in Franklin, Tennessee. Hardee's Food Systems LLC's sole member is CKE Restaurants Holdings, Inc, a Delaware corporation with its principal place of business in Franklin, Tennessee.

13. Defendant ARC Burger, LLC ("ARC") is a Delaware limited liability company with its principal place of business in California. The sole members of ARC Burger, LLC are:

    a. Coady Smith ("Smith"), a natural person domiciled in the State of California;

    b. Anand Gowda ("Gowda" or "Guarantor"), a natural person domiciled in the State of California; and

    c. Cary Devore ("Devore"), a natural person domiciled in the State of Texas.

3

1626048738.1

### III. JURISDICTION AND VENUE

14. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the matter in controversy exceeds $75,000, exclusive of interest and costs.

15. This Court has personal jurisdiction over ARC because it entered into 80 Franchise Agreements with HR, a Tennessee resident that currently maintains its principal offices in Tennessee, and because it expressly and voluntarily consented to the personal jurisdiction of the courts where HR's principal offices are located at the time a suit is filed.

16. This Court has personal jurisdiction over Gowda because he expressly and voluntarily consented to the personal jurisdiction of the courts where HR's principal offices are located at the time a suit is filed. In addition, Gowda signed 80 Guarantees as consideration of and as an inducement to the execution of the associated Franchise Agreements by HR, signed two Amendments reaffirming the Guarantees in 2023 and 2024, and the cause of action against Gowda arises from breaches of the Franchise Agreements that are the subject of the Guarantees.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because ARC and Gowda expressly and voluntarily consented to venue in the federal or state court having jurisdiction where HR's principal offices are located at the time this suit is filed, which is Franklin, Tennessee. Further, the events giving rise to the causes of action took place in this venue.

### IV. FACTUAL ALLEGATIONS

**A. ARC and High Bluff's Relationship**

18. As noted above, ARC was formed in 2023 by High Bluff Capital Partners, which was founded in 2020. ARC's three members—Coady Smith, Anand Gowda, and Cary Devore—are each a partner, principal, or board member of High Bluff.

4

19. Mr. Gowda is High Bluff's founder. He has more than 20 years' experience in private equity and is the Executive Chairman of Church's Chicken and Quiznos.

20. Mr. Smith is a principal at High Bluff, where he is responsible for diligence on new investment opportunities and overseeing High Bluff's portfolio companies.

21. Mr. Devore is a senior advisor and board member of High Bluff and a board member of both Quiznos and Church's Chicken.

22. Notwithstanding the near identity of ARC's and High Bluff's ownership, the companies executed a ten-year "Management Consulting Agreement" on August 14, 2023 ("MCA"). Under the MCA, High Bluff was to be paid the greater of five percent of ARC's prior year EBITDA or $1,000,000 (the "Fee"), or "such greater amounts" approved by ARC, to "render consulting services from time to time." ARC also agreed that it would reimburse High Bluff for "any and all out-of-pocket expenses (including, without limitation, [High Bluff's] overhead expenses)" incurred in performing services. And ARC agreed that it would, by separate agreement, pay High Bluff additional amounts for any "extraordinary services" rendered outside the ordinary course of business.

23. The MCA automatically renews annually after its initial ten-year term. While the MCA would permit ARC to terminate if it were willing to accuse High Bluff—its own members—of "gross negligence, recklessness or willful misconduct," the only other termination permitted is by written notice within sixty days prior to any renewal date or if ARC underwent a "Change of Control" and was no longer controlled by the same individuals who control High Bluff.

24. While the MCA provides that ARC would not be required to pay the Fee if any financing or other binding instruments expressly prohibited it from doing so, ARC agreed that the Fees would nonetheless accrue and bear interest at 10% per annum.

5

**B.     ARC's Obligations to HR Under the Franchise Agreements**

25.     HR is the franchisor of the Hardee's® quick service restaurant system. Hardee's® System restaurants operate under Hardee's® Restaurant Franchise Agreements.

26.     On August 15, 2023, HR and ARC entered into 80 Hardee's® Restaurant Franchise Agreements (as amended, each a "Franchise Agreement" and collectively, the "Franchise Agreements") granting ARC licenses to operate certain Hardee's® System Restaurants (each, a "Franchised Restaurant" and collectively, the "Franchised Restaurants"). The Franchise Agreements were amended twice, through a First Amendment dated August 15, 2023, and a Second Amendment dated June 23, 2024.

27.     Under the Franchise Agreements, ARC agreed to undertake certain financial obligations consistent with the licenses it was granted under the Franchise Agreements (the "Franchise Agreement Payment Obligations"). These obligations include:

a.      the obligation to spend and/or contribute certain amounts for advertising approved by HR as set forth in Sections 6.C and 8.A of the Franchise Agreements, including a weekly advertising and promotion obligation ("Advertising Fees");

b.      the obligation to pay to HR a nonrefundable and continuing royalty fee as set forth in Section 6.B of the Franchise Agreements ("Royalty Fees");

c.      the obligation to pay to HR a tuition fee for each person attending HR's required Franchise Management Training Program or other training programs and courses as set forth in Section 11.A of the Franchise Agreements ("Training Program Fees");

d.      the obligation to pay to HR a fee for access to customer data processing, enterprise data management and other technology required by HR as set forth in Appendix A of the Franchise Agreements ("Digital Tech Fee"); and

6

1626048738.1

e.      the obligation—if any payment to HR is not received from ARC on the date due under Section 6.E—to pay interest at a rate not to exceed 1.5% per fiscal period on the amounts owed ("Franchisee Interest Payment").

28.     Pursuant to Section 21.B(2) of each Franchise Agreement, if ARC defaults in the payment of any monies owed to HR when such monies become due and payable and fails to pay such monies within ten days after receiving written notice of default, HR has the right to terminate the Franchise Agreement.

29.     Pursuant to Section 6.H of each Franchise Agreement, ARC is obligated to pay HR "any and all costs and expenses incurred by HR in enforcing the terms of this Agreement."  Such costs and expenses include, but are not limited to, attorneys' fees (including fees for in-house counsel), costs incurred in creating Gross Sales reports, court and other costs of litigation including costs on appeal, as well as interest on all of the costs and expenses incurred.

**C.      ARC's Obligations to HR Under the Lease and Sublease Agreements**

30.     HR and ARC are parties to twenty-eight sublease agreements (as amended, each a "Sublease Agreement" and collectively, the "Sublease Agreements").

31.     The Sublease Agreements impose financial obligations on ARC as the subtenant (the "Sublease Payment Obligations"). These obligations include:

a.      the obligation to pay Rent to HR for each subleased location on the first date of each month during the term of the Sublease Agreement (each, a "Rent Payment" and collectively, the "Rent Payments");

b.      the obligation to pay Percentage Rent to HR for each subleased location (each a "Percentage Rent Payment" and collectively, the "Percentage Rent Payments");

7

c.     the obligation to pay to HR an amount estimated by HR to be equal to one-twelfth (1/12) of all taxes and assessments required to be paid by HR under the Prime Lease for the then-current tax year (the "Taxes");

d.     the obligation to pay any common area maintenance expenses (the "CAM Fees") that HR is required to pay pursuant to the terms of the Prime Lease;

e.     the obligation, under certain Sublease Agreements, to pay to HR as Additional Rent an administrative fee of $2,500 per year per subleased location (the "ADM Fees");

f.     the obligation to pay interest of 18% per annum or the maximum amount permitted by law on all overdue installments of Rent Payments, Percentage Rent Payments, Taxes, CAM Fees, and ADM Fees ('Sublease Interest Payment").

32.     Each Sublease Agreement gives HR the right to terminate the Sublease Agreement if ARC defaults in the payment of any amounts due under the Sublease Agreements and fails to pay such amounts within three days after receiving written notice of default.

**D.     The Promissory Note**

33.     On July 25, 2024, ARC executed a Second Initial Promissory Note in favor of HR with a Principal Amount of $690,437.66 (the "Promissory Note").

34.     Under Paragraph 4 of the Promissory Note, HR has the right to accelerate the remaining balance owed under the Promissory Note following an Event of Default as defined therein. An Event of Default includes ARC's default under any Franchise Agreement or Sublease Agreement.

8

1626048738.1

**E. ARC Defaults on Its Obligations Under the Franchise Agreements and Sublease Agreements**

35. Beginning in December 2024, ARC began failing to make payments when due under the Franchisee Agreements and the Sublease Agreements. As a result of ARC's failure to make timely payments over the course of several months, HR put ARC on notice that it was in default under the Franchise Agreements and Sublease Agreements.

36. On June 25, 2025, HR sent ARC an initial Notice of Default (the "First Notice of Default") advising ARC that it was in default under each of its payment obligations under each of the Franchise Agreements and providing a calculation of outstanding Franchise Agreement Payment Obligations through June 23, 2025, as well as interest charges through the date of the First Notice of Default.

37. On August 28, 2025, HR sent ARC a second Notice of Default (the "Second Notice of Default"). The Second Notice of Default advised ARC that it continued to be in default under each of its payment obligations under each of the Franchise Agreements. The Second Notice of Default further notified ARC that it was in default under each of the Sublease Agreements. The Second Notice of Default provided a calculation of outstanding Franchise Agreement Payment Obligations and Sublease Payment Obligations and interest charges through August 25, 2025.

38. The Second Notice of Default also notified ARC that, pursuant to HR's rights under the Franchise Agreements and Sublease Agreements, if ARC did not cure the noticed defaults within ten days of the notice, HR would have the right to terminate the Franchise Agreements and the Sublease Agreements.

39. ARC did not cure the noticed defaults.

40. On September 11, 2025, HR provided formal written notice of termination to ARC (the "Notice of Termination"). In the Notice of Termination, HR terminated the Franchise

9

Agreements, terminated the Sublease Agreements, and exercised its right to accelerate payment under the Promissory Note, notifying ARC that the unpaid principal amount of $138,174.12 under the Promissory Note was now immediately due and payable.

41.     As of the date of the Notice of Termination, ARC owed HR over $4.9 million, comprised of the outstanding Franchise Agreement Payment Obligations, outstanding Sublease Payment Obligations, the finance charges on both, and the remaining balance on the Promissory Note.

42.     More specifically, as of the date of the Notice of Termination, ARC had the following outstanding Franchise Agreement Payment Obligations:

a.     Beginning March 2025, ARC failed to timely pay HR the Advertising Fees due and owing under each of the Franchise Agreements. As of the date of the Notice of Termination, ARC owed HR more than $1.5 million in past due Advertising Fees.

b.     Beginning January 2025, ARC failed to timely pay HR the Royalty Fees due and owing under each of the Franchise Agreements. As of the date of the Notice of Termination, ARC owed HR more than $2 million in past due Royalty Fees.

c.     Beginning February 2025, ARC failed to timely pay HR the Training Program Fees due and owing under each of the Franchise Agreements. As of the date of the Notice of Termination, ARC owed HR almost $9,000 in past due Training Program Fees.

d.     Beginning January 2025, ARC failed to timely pay HR the Digital Technology Fees due and owing under each of the Franchise Agreements. As of the date of the Notice of Termination, ARC owed HR more than $100,000 in past due Digital Tech Fees.

10

e. The Franchise Interest Payments on the above amounts as of the date of the Notice of Termination total over $300,000.

43. As of the date of the Notice of Termination, ARC had the following outstanding Sublease Payment Obligations:

a. Beginning July 2025, ARC failed to timely pay HR the Rent Payments due under the Sublease Agreements. As of the date of the Notice of Termination, Franchisee owed HR over $400,000 in past due Rent Payments.

b. Beginning April 2025, ARC failed to timely pay HR the Percentage Rent Payments due under the Sublease Agreements. As of the date of the Notice of Termination, ARC owed HR over $30,000 in past due Percentage Rent Payments.

c. Beginning July 2025, ARC failed to timely pay HR the Taxes due under the Sublease Agreements. As of the date of the Notice of Termination, ARC owed HR over $40,000 in past due Taxes.

d. Beginning December 2024, ARC failed to timely pay HR the CAM Fees due under the Sublease Agreements. As of the date of the Notice of Termination, ARC owed HR almost $1,000 in past due CAM Fees.

e. Beginning July 2025, ARC failed to timely pay HR the ADM Fees due under the Sublease Agreements. As of the date of the Notice of Termination, ARC owed HR over $800 in past due ADM Fees.

f. The Sublease Interest Payments on the above amounts as of the date of the Notice of Termination total over $22,000.

11

**F. Amounts Owed Post-Termination**

### i. Post-Termination Agreement

44. Following the issuance of the Notice of Termination, the parties entered into a forbearance/standstill agreement pending the negotiation of a more formal forbearance/standstill agreement. Under the terms of the forbearance/standstill agreement, HR, while reserving all rights, agreed to permit ARC to continue to operate the Franchised Restaurants and use the Hardee's® System proprietary methods and HR's valuable trademarks and other intellectual property, provided that ARC, among other things, pay HR on a current basis, beginning September 1, 2025, the royalties, advertising fees and other fees specified in the terminated Franchise Agreements.

45. The parties mutually assented to these terms and ARC continued to operate the Franchised Restaurants pursuant to these terms, using HR's proprietary system and marks.

46. The parties' agreement was for a lawful purpose.

47. HR provided a benefit to ARC by permitting it to continue to use the unique and distinctive Hardee's® franchise system and proprietary trade names, trademarks, service marks, trade dress, etc., and to operate the Franchised Restaurants, and did so on the condition and with the expectation that ARC would comply with its payment obligations, among other requirements and obligations.

48. ARC accepted the benefit of operating the Franchised Restaurants and has, by all indications, continued to operate them profitably.

49. Defendants are bound by the parties' post-termination agreement that arose from the parties' mutual assent, and Defendants must comply with, among other things, their payment obligations, including to pay all payment obligations that have accrued since that time and that continue to accrue.

1626048738.1

50. Defendants have made only one post-termination payment and are otherwise in breach and default of the payment obligations under the parties' post-termination agreement, which amount to over $1.2 million, inclusive of interest and are continuing to accrue.

### ii. Ongoing Obligations Under the Subleases

51. Because HR has terminated each of the Sublease Agreements, ARC is currently holding the subleased premises beyond the termination of the sublease term.

52. HR has the right under each of the Sublease Agreements to recover all amounts due and payable from a holdover subtenant, including, but not limited to past-due rents.

53. ARC must therefore continue to pay the Sublease Agreement Payment Obligations that have accrued since that time and that continue to accrue.

54. ARC has not made any Sublease Agreement Payment Obligations during the holdover period, which amount to over $325,000 inclusive of interest and are continuing to accrue.

### G. The Guarantees

55. In connection with each Franchise Agreement, Gowda executed a Guarantee and Assumption of Franchisee's Obligations (each, a "Guaranty" and collectively, the "Guarantees"), pursuant to which Gowda agreed to personally guarantee all obligations under each Franchise Agreement, including ARC's monetary obligations. Gowda also signed a First Amendment and a Second Amendment to each of the Franchisee Agreements in which he reaffirmed that his obligations to guarantee ARC's obligations remained in full force and effect.

56. Gowda had a clear intent to be responsible for ARC's monetary obligations up to the amount of the Guarantee.

57. Failure of timely payment or performance of the obligations under the Guarantee constitutes an event of default under Paragraph 4.E of the Guarantee (a "Default").

13

1626048738.1

58. Upon a Default, Gowda's obligations become immediately due and payable without notice.

59. Gowda unconditionally agreed in Paragraph 5 of the Promissory Note to be personally liable for all indebtedness under the Promissory Note (the "Promissory Note Guarantee").

60. Gowda had a clear intent to be responsible for ARC's indebtedness under the Promissory Note.

61. ARC has defaulted on the Franchise Agreements and the Sublease Agreements subsequent to the date of the Promissory Note, each of which is an Event of Default entitling HR to declare the unpaid Principal Amount of the Promissory Note due and payable in full.

62. In the Second Notice of Default, HR declared the unpaid Principal Amount due and payable in full, but ARC has not rendered payment of the amount due.

63. Gowda agreed in the Promissory Note Guarantee that he would render any payment or performance required upon demand if ARC failed punctually to do so.

## V. CAUSES OF ACTION

### COUNT ONE
### Breach of Contract – Franchise Agreements and Guarantees
### All Defendants

64. HR repeats, realleges, and incorporates by reference paragraphs 1-63 as if fully set forth herein.

65. The Franchise Agreements and Guarantees are binding and valid contracts between the parties to them.

66. Defendants had contractual obligations under the Franchise Agreements and Guarantees to pay the Franchise Agreement Payment Obligations, including Advertising Fees,

14

Royalty Fees, Training Program Fees, the Digital Tech Fee, and interest owed on past-due Advertising Fees and Royalty Fees.

67. HR has performed all conditions, covenants, and promises required of it under the Franchise Agreements.

68. Defendants are in breach of the Franchise Agreements and Guarantees as a result of their failure to pay the Franchise Agreement Payment Obligations due and owing through to the date the Franchise Agreements were terminated.

69. As a direct result of Defendants' breaches, HR has been damaged in an amount to be proven at trial, but in excess of $ 4.3 million, plus costs, disbursements, interest and attorneys' fees.

**COUNT TWO**
**Breach of Contract - Breach of Post-Termination Agreement**
**All Defendants**

70. HR repeats, realleges, and incorporates by reference paragraphs 1-69 as if fully set forth herein.

71. On or about the date that HR terminated the Franchise Agreements, HR and ARC entered into an agreement under which ARC was permitted to continue to operate the Franchised Restaurants and use the Hardee's® System proprietary methods and HR's valuable trademarks and other intellectual property, provided that ARC, among other things, pay HR on a current basis, beginning September 1, 2025, the royalties, advertising fees and other fees specified in the terminated Franchise Agreements.

72. Defendants are bound by the post-termination agreement that arose from the parties' mutual agreement to permit the continued operation of the Franchised Restaurants, including Defendants' obligation to pay on a current basis the royalties, advertising fees and other fees specified in the terminated Franchise Agreements.

1626048738.1

73. Defendants are in breach of the parties' post-termination agreement as a result of Defendants' failure to pay any Franchise Agreement Payment Obligations, including Advertising Fees, Royalty Fees, Training Program Fees, Digital Tech Fee, and interest owed on past-due Advertising Fees and Royalty Fees.

74. As a direct result of Defendants' breaches, HR has been damaged in an amount to be proven at trial, but in excess of $1.2 million, plus costs, disbursements, interest and attorneys' fees.

**COUNT THREE**
**Unjust Enrichment (In the alternative)**
**ARC Burger, LLC**

75. HR repeats, realleges, and incorporates by reference paragraphs 1-74 as if fully set forth herein.

76. As a result of the HR's agreement to permit ARC to continue to operate the Franchised Restaurants, HR provided a benefit to ARC by permitting it to continue to use the unique and distinctive Hardee's® franchise system and proprietary trade names, trademarks, service marks, trade dress, etc., and to operate the Franchised Restaurants.

77. HR provided this benefit on the condition and with the expectation that ARC would honor its payment obligations.

78. ARC understood and accepted the benefit of operating the Franchised Restaurants post-termination and has, by all indications, received that benefit by continuing to operate them profitably.

79. While ARC accepted the benefit of operating the Franchised Restaurants, it has not honored its payment obligations.

16

1626048738.1

80. As a result, HR has been harmed by ARC's failure to pay HR for the benefit conferred, and ARC has been unjustly enriched from operating the Franchised Restaurants in the post-termination period.

81. It would be unfair to permit ARC to retain the benefit it received.

**COUNT FOUR**
**Breach of Contract – Sublease Agreements**
**ARC Burger, LLC**

82. HR repeats, realleges, and incorporates by reference paragraphs 1-81 as if fully set forth herein.

83. The Sublease Agreements are binding and valid contracts between the parties.

84. ARC had a contractual obligation under the Sublease Agreements to pay the Sublease Payment Obligations, including Rent, Percentage Rent, Taxes, CAM Fees, ADM Fees, and interest owed on past due amounts.

85. HR has performed all conditions, covenants, and promises required of it under the Sublease Agreements.

86. ARC is in breach of the Sublease Agreements as a result of its failure to pay the Sublease Agreement Payment Obligations due and owing through to the date the Franchise Agreements were terminated.

87. As a direct result of ARC's breaches, HR has been damaged in an amount to be proven at trial, but in excess of $827,000, plus costs, disbursements, interest and attorneys' fees.

**COUNT FIVE**
**Breach of Contract – Promissory Note**
**All Defendants**

88. HR repeats, realleges, and incorporates by reference paragraphs 1-87 as if fully set forth herein.

17

89. The Promissory Note and Promissory Note Guarantee are binding and valid contracts between the parties.

90. Defendants had a contractual obligation under the Promissory Note and Promissory Note Guarantee to pay the Principal Amount when due and payable.

91. HR had the right to accelerate the remaining balance owed under the Promissory Note following ARC's default under the Franchise Agreements and Sublease Agreements.

92. HR declared the unpaid Principal Amount of $138,174.12 due and payable in a written notice to ARC on September 11, 2025.

93. HR has performed all conditions, covenants, and promises required of it under the Promissory Note.

94. Defendants are in breach of the Promissory Note as a result of their failure to pay the Principal Amount due and owing upon HR's proper demand for payment.

95. As a direct result of Defendants' breaches, HR has been damaged in an amount to be proven at trial, but in no event less than $138,174.12, plus costs, disbursements, interest and attorneys' fees.

## VI.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Hardee's Restaurants, LLC respectfully requests the Court to enter judgment as follows:

A. An award against Defendants for breach of the Franchise Agreements for unpaid Franchise Agreement Payment Obligations plus contractual interest on unpaid amounts through to the termination date of September 11, 2025;

B. An award against Defendants for breach of the parties' post-termination agreement for unpaid Franchise Agreement Payment Obligations plus contractual interest on unpaid amounts;

18

1626048738.1

C. An award that ARC return the benefit it unjustly retained as a result of its post-termination operation of the Franchised Restaurants;

D. An award against ARC for breach of the Sublease Agreements for unpaid Sublease Payment Obligations plus contractual interest on unpaid amounts through to the date of termination;

E. An award against ARC for ongoing Sublease Payment Obligations under its holdover subtenancy plus contractual interest on unpaid amounts;

F. An award against Defendants for the Principal Amount of $138,174.12 due on the Promissory Note;

G. An order that Defendants must comply with the post-termination obligations of the Franchise Agreements;

H. HR's reasonable costs and fees;

I. Prejudgment interest on any monetary award made part of the judgment against Defendants; and

J. Such other relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ John F. Verhey (by RSH w/permission)*
John F. Verhey (IL Bar No. 44957)
DLA PIPER LLP (US)
444 West Lake Street Suite 900
Chicago, Illinois 60606-0089
john.verhey@us.dlapiper.com
(*Pro hac vice* application forthcoming)

Madeline A. Cordray (AZ Bar No. 035788)
DLA PIPER LLP (US)
2525 East Camelback Rd., Suite 1000
Phoenix, Arizona 85016
madeline.cordray@us.dlapiper.com
(*Pro hac vice* application forthcoming)

1626048738.1

<div style="margin-left:50%">

/s/ *Robb S. Harvey*

Robb S. Harvey (Tenn. BPR No. 11519)
Charley Williamson (Tenn. BRP No. 018287)
HOLLAND & KNIGHT LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
(615) 244-6380
robb.harvey@hklaw.com
charley.williamson@hklaw.com

*Attorneys for Plaintiff*
*Hardee's Restaurants, LLC*

</div>

20

1626048738.1